## Case No. 15,121.

UNITED STATES v. FLINT et al.  UNITED STATES v. THROCKMORTON et al. UNITED STATES v. CARPENTIER et al.

[4 Sawy. 42.] [1]

Circuit Court, D. California.  Sept. 4, 1876. [2]

MEXICAN LAND GRANT—BOARD OF COMMISSIONERS — JURISDICTION AND DECREES — PURCHASERS — DECREE OF CONFIRMATION—ATTORNEY GENERAL —SURVEY.

1. The obligation to which the United States succeeded, under the stipulations of the treaty by which California was acquired, was political in its character, and provision was made for its discharge by the act of March 3, 1851 [9 Stat. 631]. By this act a special tribunal was created for the settlement of claims to land in California of Spanish and Mexican origin; and the jurisdiction conferred upon the tribunal and upon the courts empowered to review its decisions was, in its nature, exclusive.

2. Final decrees, touching the validity of such claims, rendered by these tribunals, are conclusive and final between claimants and the United States. Such decrees are not open to review in any court.

[Cited in Manning v. San Jacinto Tin Co., 9 Fed. 734.]

3. The frauds for which judgments are impeachable in courts of equity are collateral acts, extrinsic to the merits. They are acts by which the successful party has prevented his adversary from presenting the merits of his case, or by which the jurisdiction of the court has been imposed upon. Collusion between the parties to obtain a decision injurious to a third person; the purloining of an adversary's testimony; the service of process in such a manner as to defeat its purpose; false representations that the parties are really before the court; are examples of such frauds as render the judgment impeachable. But, where the matter involved has been once tried, or so put in issue that it might have been tried, the judgment rendered is the highest evidence that the alleged fraud did not exist, and estops the parties from asserting the contrary. The judgment settled the matter otherwise; it became res judicata.

[Cited in Manning v. San Jacinto Tin Co., 9 Fed. 734; Steel v. St. Louis Smelting & Refining Co., 106 U. S. 454, 1 Sup. Ct. 395; U. S. v. White, 17 Fed. 562; U. S. v. San Jacinto Tin Co., 23 Fed. 280.]

[Cited in Friese v. Hummel, 26 Or. 145, 37 Pac. 458; Morrill v. Morrill, 20 Or. 96, 25 Pac. 365.]

4. Purchasers of lands under final decrees of confirmation cannot be disturbed upon charges of fraud in the prosecution of the claims confirmed and a vague allegation of notice of such fraud. Such purchasers have a right to rest in confidence upon the decrees.

[Cited in brief in U. S. v. San Pedro & Canon Del Agua Co. (N. M.) 17 Pac. 339.]

5. After the decision of the commissioners, the control of proceedings, whether to prosecute an appeal or to dismiss the same, rested exclusively with the attorney-general; and the propriety or legality of his action in any case was not the subject of review by any tribunal, and it could only be revoked by the appellate court upon his own application. In coming to a determination on the subject, he was not restricted to an examination of the transcript transmitted to him;

he could look into the archives of the former government, the reports of officers previously appointed to examine into the subject of land titles in the state, the records of the land department at Washington, and any correspondence existing between Mexico and the United States respecting the title.

6. Where the United States enters the court as a litigant, it waives its exemption from legal proceedings, and stands upon the same footing with private individuals; and, therefore, if on a consideration of all the circumstances of a given case, it be inequitable to grant the relief prayed against a citizen, such relief will be refused by a court of equity, though the United States be the suitor.

[Approved in Manning v. San Jacinto Tin Co., 9 Fed. 734. Cited in U. S. v. White, 17 Fed. 564, 565; U. S. v. San Jacinto Tin Co., 23 Fed. 287; on appeal, 125 U. S. 304, 8 Sup. Ct. 867. Disapproved in U. S. v. Rose, 24 Fed. 196. Cited in U. S. v. Wallamet V. & C. M. W. R. Co., 42 Fed. 357, 44 Fed. 240. Distinguished in U. S. v. Adams, 54 Fed. 115.]

[Cited in brief in U. S. v. San Pedro & Canon Del Agua Co., 17 Pac. 339.]

7. In the absence of an act of congress, the power of the attorney general to institute proceedings to vacate these decrees of confirmation is doubtful

8. Whether the issue of a previous grant of eleven leagues to a claimant disqualifies him from receiving a second grant, is a question of law, and any error in its decision could be corrected only on appeal.

9. The subject of surveys of confirmed claims is under the control of the land department, and its action is not subject to the supervision of the courts, however erroneous.

[Cited in Leitensdorfer v. Campbell, Case No. 8,225; Manning v. San Jacinto Tin Co., 9 Fed. 733; U. S. v. Maxwell Land-Grant Co., 21 Fed. 22; U. S. v. San Jacinto Tin Co., 23 Fed. 282; U. S. v. Hancock, 30 Fed. 853; Cragin v. Powell, 128 U. S. 699, 9 Sup. Ct. 206.]

[Cited in Stoneroad v. Stoneroad, 12 Pac. 742.]

10. If the bill showed that the decree had been procured by fraud of the grossest character, the court would still be without jurisdiction, for it has no authority to pass upon the propriety of the decree; i. e., to decide upon the validity of the claim, nor to demand the cause to any other forum where that question may be determined. Per Hoffman, J.

[Cited in U. S. v. San Jacinto Tin Co., 23 Fed. 294; U. S. v. Hancock, 30 Fed. 860; U. S. v. Oregon C. M. R. Co., 41 Fed. 501.]

[11. Cited in Pratt v. California Min. Co., 24 Fed. 878, to the point that it is an inherent principle of courts of equity to refuse to interpose in behalf of stale demands, since from the lapse of time and the nature of the case it is probable justice cannot be done.]

The three cases are suits in equity [by the United States against Benjamin Flint and others, S. R. Throckmorton and others, and H. W. Carpentier and others] to vacate the patents issued by the United States upon confirmed Mexican grants, on the ground that said grants are not genuine, and that their confirmation was procured by fraud on the part of the claimants, in presenting fraudulent grants, and concealing the facts from the officers of the government. They all present substantially the same ques-

---

[1] [Reported by L. S. B. Sawyer, Esq., and here reprinted by permission.]

[2] [U. S. v. Throckmorton, affirmed in 98 U. S. 61.]

tions, and were argued and considered together. The opinion of FIELD, Circuit Justice, applies especially to the case of U. S. v. Flint, and the opinion of HOFFMAN, District Judge, to the case of U. S. v. Carpentier. But the reasoning in both opinions applies to all the cases.

John M. Coghlan, U. S. Atty., J. B. Howard, and John B. Felton, for complainant.

Wm. Mathews, T. B. Bishop, J. J. Williams, H. P. Irving, E. R. Carpentier, Volney E. Howard, and Edmond L. Goold, for defendants.

Before FIELD, Circuit Justice, SAWYER, Circuit Judge, and HOFFMAN, District Judge.

FIELD, Circuit Justice. The case of U. S. v. Flint is a suit in equity, the main object of which is to set aside and annul the decree of the district court of the Southern district of California, confirming the claim of Teodocio Yorba to the rancho Lomas de Santiago, situated in the county of Los Angeles, in this state, and to recall and cancel the patent issued thereon by the United States. It is brought by the district attorney for California, and purports to be on behalf of the United States. It appears, from the allegations of the bill, and the record to which the bill refers, that in October, 1852, the claimant, who has since deceased, presented to the board of land commissioners, created under the act of congress of March 3, 1851, to ascertain and settle private land claims in California, a petition setting forth his claim to the rancho in question, and stating that the same was granted to him in May, 1846, by the governor of the department; that the grant had been approved by the departmental assembly; that juridical possession of the land had been delivered to him by competent authority, and its boundaries defined; and that he was then and had been previously in its peaceable occupation.

With the petition, and as part thereof, the claimant presented copies of the grant and act of juridical possession, accompanied by a translation of the same, and prayed that the grant be adjudged valid and confirmed to him. The board of commissioners considered the claim thus presented, and took the depositions of several witnesses in support of it, and, in August, 1854, rendered a decree adjudging it to be valid, and directing its confirmation. In November, 1855, a petition was filed on behalf of the United States, in the district court for the Southern district of California, for a review of the decision, alleging that the claim confirmed was invalid, and the decision of the commissioners erroneous; that the allegations of the complainant in his petition were unsupported by sufficient proof; and denying that he had any right or title to the land confirmed, or to any part of it. The claimant answered this petition, joining issue upon its allegations, and the court took jurisdiction of the case, heard it anew, and, in December, 1856, rendered its decree, affirming the decision of the commissioners, and readjudged the claim to be valid. An appeal from this decree to the supreme court of the United States was allowed, but the attorney general, after some months' deliberation, gave notice that the appeal would not be prosecuted; and thereupon the district court, upon the consent of the district attorney, vacated the order allowing the appeal, and gave the claimant leave to proceed upon its decree as a final decree in the case. A survey of the land was subsequently made under the direction of the surveyor general of the United States for California, and approved by that officer; and in February, 1868, a patent was issued to the claimant.

It thus appears that, after a contest for nearly sixteen years before officers and tribunals of the United States, the claimant obtained a patent from the government, an instrument designed to give to its holder security and protection in the enjoyment of the property covered by its terms. All the defendants acquired their interests in the land after the decree of confirmation, and two of them after the patent was issued. Nineteen years after the final decree was thus rendered and eight years after the patent was issued, the present bill was filed. And as grounds for setting aside and annulling the decree, and recalling and canceling the patent, the district attorney alleges upon information and belief: 1. That the grant and act of juridical possession were made subsequently to the acquisition of the country in 1846, and were fraudulently antedated, and that this appears on the face of the original papers on file in the Spanish archives in the custody of the surveyor-general of the United States; that the claimant fraudulently omitted to exhibit a complete record of the proceedings, and only presented extracts from them; and by this suppression the law agent of the United States was misled, the United States deprived of all opportunity to contest the confirmation, and the land commission and court were deceived into a confirmation of the claim; and, 2. That previous to the issue of the alleged grant, and as early as 1840, the claimant had obtained from the Mexican nation a grant of eleven leagues, situated in the counties of Sacramento, San Joaquin and Amador, which was subsequently confirmed by the supreme court of the United States; that by the laws of Mexico, a grant for more than eleven leagues could not be made to the same person, and that the claimant was therefore disqualified from receiving any other grant, and that the existence of this prior grant was fraudulently concealed from the law agent of the United States, the land commission, and the district court.

The district attorney also alleges in the bill, upon information and belief, that the approved survey is not in conformity with the boundaries given in the diseño, or map accompanying the grant and the act of juridical possession, but embraces a much greater quantity, and was made upon the fraudulent instigation and procurement of three of the defendants. The district attorney therefore prays that, in case he fail to obtain the annulment of the decree, and the recall and cancellation of the patent, the boundaries of the tract confirmed may be reestablished and fixed in accordance with the views stated by him as to the location intended by the grant and act of juridical possession.

The first inquiry, which naturally arises upon the perusal of this bill, is as to what jurisdiction this court has to interfere with and review the determinations of the land commission and district court upon the validity of claims to land derived from Mexican or Spanish authorities, and of the land department in approving the surveys of the claims confirmed. The questions submitted to the commission and the district court were not within the ordinary cognizance of a court of law or a court of equity. They related to the obligations devolving upon our government from the concessions of the former government to its inhabitants. How far these concessions should be respected, and how far enforced, were the matters to be considered; and in their determination the tribunals were to be governed by the stipulations of the treaty, the law of nations, the laws, usage and customs of the former government, the principles of equity, and the decisions of the supreme court, so far as they were applicable.

By the transfer of California from Mexico to the United States, the rights of private property of the inhabitants were not affected. They remained as under the former government. The public property of Mexico and sovereignty over the country alone passed to the United States. This was in accordance with the rule of public law, which is recognized by all civilized nations when territory is ceded by one state to another. The obligation, therefore, to protect private rights of property devolved upon the United States, without any formal declaration to that effect. But, in recognition of this obligation, Mexico obtained from the United States, in the treaty of cession, an express stipulation for such protection. And the term property, as applied to lands, and as used in the treaty, comprehends every species of title, perfect or imperfect. "It embraces," says Chief Justice Marshall, "those rights which are executory as well as those which are executed." The United States, therefore, took California bound by the established principles of public law, and by express stipulation of the treaty, to protect all private rights of property of the inhabitants. The obligation rested for its fulfillment in the good faith of the government, and required legislative action. It could, therefore, only be discharged in such manner and at such times and upon such conditions as congress might, in its discretion, direct. In its discharge, such action was required as would enable the inhabitants to assert and maintain their rights to the property in the courts of the country as fully and absolutely as though their titles were derived directly from the United States. Where the titles were imperfect (and such was the condition of nearly all the titles held in the country), further action, by way of confirmation or release from the new government, was essential. With respect to all such titles, and, indeed, with respect to all matters dependent upon executory engagements of the government, the ordinary courts of the United States, whether of law or equity, were entirely powerless. They were without jurisdiction, and utterly incompetent to deal with them.

By the act of March 3, 1851, the legislative department prescribed the mode in which the provisions of the treaty should be carried out, and the obligations of the government to the former inhabitants discharged, so far as their rights respected the territory acquired; and thus provided the means of separating their property from the public domain. That act created a commission of three persons, to be appointed by the president, by and with the advice and consent of the senate, for the express purpose of ascertaining and settling private land claims in the state. It gave a secretary to the commission, skilled in the Spanish and English languages, to act as interpreter and to keep a record of its proceedings. It provided an agent, learned in the law and skilled in those languages, to superintend the interests of the United States, and it was made his duty to attend the meetings of the commissioners, to collect testimony on behalf of the United States, and to be present on all occasions when the claimant, in any case, took depositions. To the commission, every person claiming lands in California, by virtue of any right or title derived from the Spanish or Mexican governments, was required, on pain of forfeiting his land, to present his claim, together with the documentary evidence and testimony upon which he relied in its support. The commissioners, while sitting as a board, and at their chambers, were authorized to administer oaths and take depositions in any case pending before them. The testimony was to be reduced to writing, and recorded in books provided for that purpose. The commissioners were obliged to hear every case, and decide upon the validity of the claim, and, within thirty days after their decision, to certify the same, with the reasons on which it was founded, to the district attorney of the district. The act provided also for a review of the decision of the commissioners, upon petition of the

claimant or the district attorney, setting forth the grounds upon which the validity or invalidity of the claim was asserted. To the petition an answer was required from the contestant, whether claimant or the United States. Subsequently, in August, 1852, the act was changed in this particular, and, when a decision was rendered by the commissioners, they were required to prepare two certified transcripts of their proceedings and decisions, and of the papers and evidence upon which the same were founded, one of which was to be transmitted to the attorney-general, and the other filed with the clerk of the district court, and this filing operated as an appeal on behalf of the party against whom the decision was rendered. In case the decision was against the United States, the attorney-general, within six months after receiving the transcript, was required to cause a notice to be filed with the clerk that the appeal would be prosecuted, or it was to be regarded as dismissed.

Upon the review by the district court upon the petition or appeal, not merely the evidence before the commissioners was considered, but further evidence could be taken by either the claimant or the government; so that, in fact, the whole matter was heard anew, as upon an original proceeding. From its decision, an appeal lay to the supreme court of the United States.

As thus seen, the most ample powers were vested in the commissioners and the district court to inquire into the merits of every claim; and they were not restricted in their deliberations by any narrow rules of procedure or technical rules of evidence, but could take into consideration the principles of public law and of equity in their broadest sense. When the claim was finally confirmed, the act provided for its survey and location, and the issue of a patent to the claimant. The decrees and the patents were intended to be final and conclusive of the rights of the parties, as between them and the United States. The act, in declaring that they should only be conclusive between the United States and the claimants, did, in fact, declare that as between them they should have that character.

Here, then, we have a special tribunal, established for the express purpose of ascertaining and passing upon private claims to land derived from Spanish or Mexican authorities, clothed with ample powers to investigate the subject and determine the validity of every claim, and the propriety of its recognition by the government, capable as any court could possibly be made of detecting frauds connected with the claim, and whose first inquiry in every case was necessarily as to the authenticity and genuineness of the documents upon which the claim was founded.

We have a special jurisdiction of a like nature in the district court to review the decision made by the commissioner, and investigate anew the claim. We have principles prescribed for the government of both commission and court in these cases, and of the supreme court, upon appeal from their decisions, not applicable in ordinary proceedings, either at law or in equity, and as already stated, every person claiming land in the state was required to present his claim for investigation. The onerous duty thus thrown upon him was relieved of its oppressive character by the accompanying assurance, that, when his claim was adjudged valid, the adjudication should be final and conclusive.

On principle, such adjudications cannot be reviewed or defeated by a court of equity, upon any suggestion that the commissioners and court misapprehended the law, or were mistaken as to the evidence before them, even if that consisted of fabricated papers supported by perjured testimony. The very questions presented by the present bill were necessarily involved in the proceeding before the commissioners and the district court, and the credibility of the testimony offered was a matter considered by them. Whether the grant produced by the claimant was genuine, and the claim resting thereon was entitled to confirmation, were the points at issue. The bill avers that the alleged grant was not genuine because it was ante-dated. But the genuineness of the document was the matter sub judice, and could not have been established, and the claim based upon it affirmed, except by evidence satisfactory to the commission and court, that it was made at the time stated.

It is to no purpose in such case to invoke the doctrine that fraud vitiates all transactions, even the most solemn, and that a court of equity will set aside or enjoin the enforcement of the most formal judgments when obtained by fraud. The doctrine of equity in this respect is not questioned; it is a doctrine of the highest value in the administration of justice, and its assertion in proper cases is essential to any remedial system adequate to the necessities of society. But it cannot be invoked to reopen a case in which the same matter has been once tried, or so put in issue between the parties that it might have been tried. The judgment rendered in such a case is itself the highest evidence that the alleged fraud did not exist, and estops the parties from asserting the contrary. It is afterwards mere assumption to say that the fraud was perpetrated. The judgment has settled the matter otherwise; it is res judicata.

The frauds for which courts of equity will interfere to set aside or stay the enforcement of a judgment of a court having jurisdiction of the subject-matter and the parties, must consist of extrinsic collateral acts not involved in the consideration of the merits. They must be acts by which the successful party has prevented his adversary from presenting the merits of his case, or by which the jurisdiction of the court has been imposed upon.

All litigants are equally entitled to justice from the tribunals of the country; they can claim equal opportunities of producing their testimony and presenting their case, and they can equally have the advocacy of counsel. Whenever one party by any contrivance prevents his adversary from having this equality with him before the courts, he commits a fraud upon public justice, which, resulting in private injury, may be the ground of equitable relief against the judgment recovered. Thus, if, through his instrumentality, the witnesses of his adversary be forcibly detained from the court, or bribed to disobey its subpœna, or the testimony of his adversary be secreted or purloined, or if the citation to him be given under such circumstances as to defeat its purpose, a fraud is committed, for which relief will be granted by a court of equity, if it produce injury to the innocent party. Any conduct of the kind mentioned would tend to prevent a fair trial on the merits, and thus to deprive the innocent party of his rights. So, if the litigation be collusive; if the parties be fictitious; if real parties affected are falsely stated to be before the court, the judgment recovered may be set aside or its enforcement restrained, for in all these cases there would be the want of the actual litigation which is essential to a valid judicial determination. To every such case the words of the jurist would be applicable: "Fabula, non judicium, hoc est; in scena, non in foro, res agitur."

The credibility of testimony given in a case, bearing upon the issue, is not an extrinsic collateral act, but is a matter involved in the consideration of the merits; and the introduction of false testimony, known or shown to be so, does not affect the validity of the judgment rendered. In every litigated case where the interests involved are large, there is generally conflicting evidence. Witnesses, looking at the same transaction from different standpoints, give different accounts of it. The statements of some are unconsciously affected by their wishes, hopes, or prejudices. Some, from defective recollection, will blend what they themselves saw or heard with what they have received from the narration of others. Uncertainty as to the truth in a contested case will thus arise from the imperfection of human testimony. In addition to this source of uncertainty may be added the possibility of the perjury of witnesses, and the fabrication of documents. The cupidity of some and the corruption of others may lead to the use of these culpable means of gaining a cause. But every litigant enters upon the trial of a cause, knowing not merely the uncertainty of human testimony when honestly given, but that, if he has an unscrupulous antagonist, he may have to encounter frauds of this character. He takes the chances of establishing his case by opposing testimony, and by subjecting his opponent's witnesses to the scrutiny of a searching cross-examination. The case is not the less tried on its merits, and the judgment rendered is none the less conclusive by reason of the false testimony produced. Thus, if an action be brought upon a promissory note, and issue be joined on its execution, and judgment go for the plaintiff, and there be no appeal, or if an appeal be taken, and the judgment be affirmed, the judgment is conclusive between the parties, although, in fact, the note may have been forged and the witnesses who proved its execution may have committed perjury in their testimony. The rules of evidence, the cross-examination of witnesses, and the fear of criminal prosecution with the production of counter testimony, constitute the only security afforded by law to litigants in such cases. A court of equity could not afterward interfere upon an allegation of the forgery and false testimony, for that would be to reopen the case to a trial upon the execution of the note, which had already been sub judice, and passed into judgment.

These views are in consonance with the adjudged cases. We have looked in vain through all those cited by the learned associate counsel in the Throckmorton Case for anything infringing upon them. In the Duchess of Kingston's Case [1 Leach, 146] the sentence of the spiritual court was held to be fraudulent and void, because obtained by collusion of the parties. And, in giving the opinion of the judges to the house of lords, Chief Justice De Grey observed that, although a judgment was conclusive evidence upon the point involved, and could not be impeached from within, yet, like all other acts of the highest judicial authority, could be impeached from without, and that fraud was an extrinsic collateral act which vitiated the most solemn proceedings of courts of justice.

In the Shedden Case, 1 Macq. 535, the question was whether a judgment of the court of sessions of Scotland against the legitimacy of the plaintiff, affirmed by the house of lords, could be attacked in another suit in the inferior court, and treated as a nullity for collusive suppression of proof which would have established his parents' marriage. The house of lords held that the judgment could be thus attacked, but that the allegations of fraud and collusion in the case were not sufficiently specific, pointed, and relevant to be admitted to proof. Opinions in the case were given by the chancellor and two of the law lords, Brougham and St. Leonards. The judgment of the house of lords, said Brougham, was to be "dealt with in the inferior court before which its merits were brought; that is to say, not the merits of the judgment, but the merits of the parties who had so fraudulently obtained it—the question being, was it a real judgment or not? For that is the only question in such cases, and that is the question in this case."

In Fermor's Case, 3 Coke, 77, the tenant continued to pay rent to his landlord after he had levied a fine with proclamation to bar the inheritance, and thus kept the latter in igno-

rance of that proceeding. The tenant attempting, after the expiration of the lease, to hold the property on the ground that the right of the landlord was barred by the lapse of time allowed by statute to make an entry or bring his action after the fine. the court, upon a bill filed for relief, held that he was not barred, by reason of the deception practiced upon him. The payment of the rent was in fact a declaration by the tenant that his relation to the landlord had not changed, and operated as a fraud preventing the latter from asserting his rights.

Great stress is placed by the learned associate counsel upon these last two cases; but it is evident, from the statement we have made, that the fraud alleged in both cases was an extrinsic collateral act which prevented the complaining party, in the one instance, from having the merits of his case considered, and in the other instance from taking proceedings for his protection. So in all the other cases, extrinsic collateral acts of fraud will be found to constitute the grounds upon which the court has acted. And on principle it must be so, for if the merits of a case could be a second time examined by a new suit, upon a suggestion of false testimony, documentary or oral, in the first case there would be no end to litigation. The greater the interests involved in a suit, the severer generally the contention; and in the majority of such cases, the recovery of judgment would be the occasion of a new suit to vacate it, or restrain its enforcement. If the present bill could be sustained upon the grounds alleged, and we should set aside the decree of the district court, a new bill might years hence be filed to annul our judgment and reinstate the original decree, on the same grounds urged in this case, that fabricated papers and false testimony had been used before us, which eluded the scrutiny of the counsel and escaped our detection. Of course, under such a system of procedure, the settlement of land titles in the state would be postponed indefinitely, and the industries and improvements, which require for their growth the assured possession of land, would be greatly paralyzed.

For the reasons stated, we are of opinion that there is no ground of fraud presented by the bill for the interference of a court of equity with the decree of confirmation rendered by the district court. It is upon that ground alone that the bill proceeds. It is not a bill of review for new matter, discovered since the decree. A bill of that character can only be filed by leave of the court; and that cannot be obtained without a showing that the new matter could not have been used in the original cause, and could not previously have been ascertained by reasonable diligence. It does not lie where the decree in the original cause was obtained by consent. or where objections to the decree rendered were subsequently withdrawn and consent was given to its execution. And it can only be allowed by a court possessing the power, upon a review of the case, to determine the rights of the parties to the property, or in the matter involved, or, at least, authorized to remit the case to a tribunal having adequate jurisdiction for that purpose. The present bill was not filed upon leave; and this court possesses no power to determine the right of the claimant, upon any review of the case, to a confirmation of his claim, and the only tribunal to which such a determination could be remitted has long since ceased to exist.

But there are other and equally potential grounds against the maintenance of the present suit. The land commission and the district court, though exercising a special jurisdiction. were invested with very large and extensive powers. They were not, as already stated, bound in their decisions to any strict rules of technical law, but could be governed by the principles of equity in their widest scope. The result of their inquiries was to guide the government in the discharge of its treaty obligations. Considerations, therefore, which could not be presented to ordinary tribunals, might very properly be regarded by them.

After the determination of the commissioners, if against the United States, the control of the proceedings was placed with the attorney-general. It rested with him exclusively to determine whether the appeal from the commissioners, taken by filing a copy of the transcript with the clerk of the district court, should be prosecuted or dismissed. So, also, when an appeal was taken from the decree of the district court. he could. in the same way. direct its prosecution or dismissal. Considerations of policy. as well as of strict right, might be deemed by him sufficient to control his action in this respect. In coming to a determination on the subject; he was not restricted to an examination of the transcript transmitted to him; he could look into the archives of the former government, the reports of officers previously appointed to examine into the subject of the land titles of the state, the records of the land department at Washington, and any correspondence existing between Mexico and the United States respecting the title. His power was unlimited, and the propriety or legality of his action in any case was not the subject of review by any tribunal whatever. and it could only be revoked by the appellate court upon his own application.

In the case of Yorba [unreported], the appeal from the decree of confirmation, rendered by the district court, was dismissed upon notice of the attorney-general that the appeal would not be prosecuted, and thereupon the decree became final. The decree was thus assented to by the highest legal officer of the government, specially charged with supervision over the subject. The validity of the decree, and of the grant upon which the claim of Yorba was founded, was thus forever put at rest. From that day it could never be successfully questioned in any form of pro-

cedure, or by any tribunal known to our laws. It was a closed question for all time.

But this is not all. The defendants purchased their interests after the final decree. They are charged in the bill. it is true, generally, with notice of the alleged frauds of the claimant, but when, or where, or in what manner they had notice. is not averred. The vagueness of the allegation gives it only the weight of mere clamor. But. assuming that the defendants had sufficient notice to put them upon inquiry, they had at the same time notice of the decree, which was an adjudication—the highest possible evidence—that the alleged frauds had no actual existence; and that to this adjudication the government, through its attorney-general, had consented. They had a right, therefore, to rely implicitly upon the decree. and rest in confidence upon the assurance of its finality, given by the only officer of the United States who could question it. They can, therefore, justly insist upon protection in the property purchased; and no court of equity. under the circumstances, would lend its aid to the commission of so great a wrong as the destruction of their title.

Where the district attorney of this district obtains authority to institute. in the name of the United States, a suit for that purpose. we are not informed. There is no law of congress which requires it or allows it; and we have sought in vain for the power of the attorney-general to direct it. That officer can. it is true, institute or direct the institution of suits for the revocation and cancellation of patents of lands belonging to the United States. issued upon false and fraudulent representations to the executive officers of the land department, or upon their misconstruction of the law. He is the legal adviser of the heads of the executive departments, and if they are fraudulently imposed upon, or have mistaken the law, he can take the necessary legal proceedings to recall the results of their action. But that is a very different matter from instituting or directing proceedings to vacate or recall patents founded upon decrees of a commission or court exercising a special and exclusive jurisdiction over the subjects investigated. where the law declares that such decrees shall be final and conclusive between the parties. and to which decrees the attorney-general in office at the time assented. Those decrees established the obligation of the United States to the claimants under the treaty: and if the legislative department. which authorized the proceedings before the commission and court. be satisfied with the result, it is difficult to see upon what pretense the attorney-general can seek to disturb it. If the attorney-general, by virtue of his office, possesses any such extraordinary power. as claimed in the case. to disregard the action of his predecessor, and to renew litigation at his pleasure respecting the titles of a whole people. upon a suggestion that false testimony may have been used in the original proceedings. the security which the holders of patents from the government issued upon such decrees have hitherto felt in their possessions is unfounded and delusive. We must have further evidence than is presented to us before we can admit the existence of a power so liable to abuse, and so dangerous to the peace of the community.

But if we admit that the attorney-general is authorized to direct the institution of a suit like the present. in the name of the United States. and that the district attorney has been thus directed. his power in this respect must be exercised in subordination to those rules of procedure and those principles of equity which govern private litigants seeking to avoid a previous judgment against them. The United States, by virtue of their sovereign character. may claim exemption from legal proceedings; but when they enter the courts of the country as a litigant they waive this exemption. and stand on the same footing with private individuals. Unless otherwise provided by statute. the same rules as to the admissibility of evidence are then applied to them; the same strictness as to motions and appeals is enforced; they must move for a new trial or take an appeal within the same time and in like manner, and they are equally bound to act upon evidence within their reach. And, when they go into a court of equity, they must equally present a case by allegation and proof entitling them to equitable relief.

Although, on grounds of wise public policy, no statute of limitations runs against the Uniter States. and no laches in bringing a suit can be imputed to them, yet the facility with which the truth could originally have been shown by them if different from the finding made; the changed condition of the parties and of the property from lapse of time; the difficulty, from this cause. of meeting objections which might. perhaps, at the time. have been readily explained; and the acquisition of interests by third parties upon faith of the decree, are elements which will always be considered by the court in determining whether it be equitable to grant the relief prayed. All the attendant circumstances of each case will be weighed. that no wrong be done to the citizen, though the government be the suitor against him.

The bill in the present case not only does not disclose, as already shown, any extrinsic collateral acts of fraud constituting grounds for equitable relief, but alleges that the antedating of the grant and act of juridical possession, which form the gravamen of complaint, appear on the face of the original documents on file in the archives in the custody of the surveyor-general of the United States. If this be so, the law agent should have shown the fact by the production of the originals. He should have inspected original documents in all cases where copies alone were offered by the claimant, whether suspicions were excited or not as to their gen-

uineness. The law of Mexico with respect to the alienation of her public lands was well known at the time. It had been the subject of reports to the government by agents employed to look into the grants of the former government, and of consideration and comment by the courts in numerous instances. That law pointed out the proceedings required for the acquisition of titles of land from Mexico, and showed that a record of them was required to be kept. That record was in the possession of the United States, and should have been examined by the law agent of the government whenever any of its entries or documents were the foundation of a claim. He was appointed for the express purpose of looking after and protecting the interests of the United States. The allegation that the claimant was guilty of a fraudulent suppression in not producing all the documents in the archives respecting his title is puerile. He produced all that was necessary to present his claim, and if the law agent was not satisfied with them, he should have made his objection at the time. The archives were not in an "unsearchable condition," as alleged, until 1858; but even if they had been, the law agent could still have insisted upon the production of the originals for inspection.

After the archives were arranged and the alleged "unsearchable condition" ceased, nearly eighteen years elapsed before the present bill was filed, and no excuse is offered for this delay. During these eighteen years, which constitute a period equivalent almost to a century in other countries, great changes in the condition and value of real property in the state have occurred. During this period, the original claimant, who might perhaps have explained the alleged alteration of dates, has deceased, and third parties have acquired his interests, and, it is said, have made valuable and expensive improvements upon the property. Courts of equity will not entertain a suit to vacate a decree, even in case of palpable frauds, when there has been unnecessary delay in its institution, and the rights of third parties, as in this case, have intervened in reliance upon the decree. Considerations of public policy require prompt action in such cases, and if, by delay in acting, innocent parties have acquired interests, the courts will turn a deaf ear to the complaining party. This is the doctrine of equity, irrespective of any statute of limitations, and irrespective of the character of the suitor. It is essential that this doctrine should be vigorously upheld for the repose of titles and the security of property.

It only remains to notice the allegations of the bill with respect to a previous grant of eleven leagues, stated to have been obtained by the claimant from the Mexican nation in 1840, and the allegation that the approved survey of the claim confirmed was not in accordance with the map accompany-ing the grant, and the act of juridical possession.

Whether the issue of a previous grant to the claimant for the quantity designated would have disqualified him from receiving a second grant, was a question of law, to be determined by the commissioners and district court; and any error committed in its determination could only be corrected on appeal. And the allegation of fraudulent concealment by the claimant of the existence of the prior grant is an idle one in the face of the fact that the Mexican law, of which the court is bound to take notice, required a record of every grant to be kept, and that this record, with other public property, passed to the United States on the cession of the country. If there was any such grant as stated, so far from its existence being concealed by the claimant, the evidence of its existence was in the custody of the government. and its attention had been specially directed to the document by agents appointed to ascertain what grants had been made by the former government, who examined the records and reported a list of all grants found among them. Allegations thus in conflict with the public records and public history of the country need not be specially controverted any more than allegations at variance with the settled law. A fraudulent concealment by the claimant of a public record, never in his possession, but always in the keeping of the government, and open at all times to the inspection of the world, was a thing impossible. The bill might, with as much propriety, have alleged that the claimant concealed from the court one of the public statutes of the country.

As to the alleged error in the survey of the claim, it need only be observed that the whole subject of surveys upon confirmed grants, except as provided by the act of 1860, which did not embrace this case, was under the control of the land department, and was not subject to the supervision of the courts. Whether the survey conforms to the claim confirmed, or varies from it, is a matter with which the courts have nothing to do; that belongs to a department whose action is not the subject of review by the judiciary in any case, however erroneous. The courts can only examine into the correctness of a survey when, in a controversy between parties, it is alleged that the survey made infringes upon the prior rights of one of them; and can then look into it only so far as may be necessary to protect such rights. They cannot order a new survey, or change that already made.

It follows, from the views we have expressed, that the demurrer to the bill must be sustained; and as no amendment would reach the principal objection, namely: that the alleged frauds are not such extrinsic collateral acts as would justify the interference of equity with the decree of confirmation, the bill must be dismissed.

The principal objection to the bill in this case applies with equal force to the bills in the Throckmorton and Carpentier Cases, and the demurrers in those cases will also be sustained, and the bills dismissed. The allegation in the Throckmorton Case, that the defendant Howard had notice of the fabrication of the papers from the claimant, given in other proceedings before the board, and other allegations imputing guilty knowledge to him and to the other defendants, are too vague and general to merit consideration, made as they are in a bill not verified, and only upon information and belief. The district attorney should at least have stated the sources of his information · and the grounds of his belief, that the court might see that the former was something better than idle rumor, and the latter something more than unfounded credulity.

The defendant Howard has filed an answer denying under oath, generally and specifically, every charge against him; but by stipulation on the argument, he is to have the benefit of the decision upon the demurrer.

As the questions presented in the several cases are of vast importance to the people of this state, the district judge, whose great experience in the examination of land cases gives weight to his views, will read a concurrent opinion with special reference to the Carpentier Case.

Our judgment is that the demurrers be sustained in the three cases, and the bills be dismissed; and it is so ordered.

HOFFMAN, District Judge, concurring. As the principal questions involved in these cases are the same, they have been argued and submitted together. For convenience of treatment, I have confined my attention, in this opinion, to the case of U. S. v. Carpentier; but the views expressed will apply to all.

The bill in this case in substance alleges that on the ninth of May, 1852, Victor Castro and Juan Jose Castro presented to the board of commissioners for ascertaining and settling private land claims in California, a petition praying a confirmation of their title to a certain sobrante or surplus of lands lying between the ranchos of San Antonio, San Pablo, Pinole, Moraga and Valencia. That in support of this claim, the defendant Carpentier, as attorney for the other defendants, presented to the board certain documentary proofs in the bill particularly mentioned.

That the board of commissioners considered the claim, and on the third day of July, 1855, rendered an opinion thereon, and, on the same day, rendered a final decree therein, adjudging "the claim of the said petitioners, Juan Jose and Victor Castro, to be valid, and decreeing that the same be and is hereby confirmed."

That afterwards, on or about the sixth day of February, 1856, a certified copy of said proceedings and decree was duly filed with the clerk of the United States district court for the Northern district of California.

That on the fourth of April, 1856, a notice was filed from the attorney-general of the United States, to the effect that the appeal from the decision of the board of commissioners would be prosecuted by the United States.

That on the sixth of April, 1857, a further notice from the attorney-general was filed, to the effect that the appeal would not be prosecuted by the United States, and on the same day a stipulation was signed by Wm. Blanding, Esq., district attorney, and by the attorney for the claimants, consenting that the appeal be withdrawn and dismissed. Upon which notice and stipulation an order was made by the district court, dismissing the appeal and giving leave to the claimants to proceed under the decree of the board of commissioners as under final decree.

That since said date no other proceedings have been had in said case or claim.

The bill further charges that the documentary evidence so presented to the board by the claimants was forged, fraudulent, antedated, and fabricated—in pursuance of a conspiracy entered into by Juan Jose and Victor Castro, Juan B. Alvarado and Francisco Arce, whose names appear on the said documents. That the said simulated petition and grant were so forged, fabricated, and antedated with the full knowledge and consent of the defendants, Carpentier and Adams, and that they have, from the date of said forgery, claimed and asserted title to the said sobrante lands, or a portion thereof.

The bill further charges, that in the proceedings before the board, the defendants, Carpentier, Adams and Castro, and their assistants, intentionally and fraudulently suppressed and failed to present to the said board the grants which had been made by the government of Mexico of the said ranchos of San Antonio San Pablo, Pinole, Moraga, and Valencia, with intent to conceal from the law agent and from the said commissioners the fact that the said pretended sobrante had been antedated as aforesaid, and that if said grants had been presented, it would have appeared that two of the said ranchos were not granted until several months subsequently to the date of the said pretended sobrante grant.

That by the said fraudulent misrepresentations, concealment, and suppression, the law agent was deceived and misled, and the United States deprived of all opportunity to contest the confirmation of said grant, on the grounds aforesaid, and the said commissioners were likewise deceived and misled, and induced to confirm the grant to the manifest detriment of the United States.

The bill further avers that the facts aforesaid were not discovered by the United States until long after the said grant had been confirmed, and not until within one year next preceding the filing of this bill, and "that said facts have been derived from the in-

formation of living witnesses, from an examination of the archives, from court records, and from other sources."

The prayer of the bill is that by the decree of this court the said grant be declared fraudulent and invalid, and that the confirmation thereof was obtained by fraud; that the dismissal of the appeal in the district court was obtained by fraud; that said grant and confirmation be annulled and set aside; and that said defendants, and each of them, be forever estopped from asserting any title to said lands under said pretended grant or decree of confirmation, purchase, or possession; and that the same are public lands of the United States.

The defendants have demurred to the bill on the ground that this court has no jurisdiction of the subject-matter of the suit.

By the ninth article of the treaty of Guadalupe Hidalgo, it was stipulated "that Mexican citizens shall be maintained and protected in the free enjoyment of their liberty and property, and secured in the free exercise of their religion, without molestation."

To enable the United States to fulfill this obligation, it was necessary to provide means for ascertaining what lands in the ceded territory were held in private ownership, and of what lands the title passed to the United States.

The means adopted were the instrumentalities and proceedings provided in the act of March 3, 1851.

Its title expresses its object. It is entitled "An act to ascertain and settle private land claims in California."

The first section provides that, for the purpose of ascertaining and settling private land claims in California, a commission shall be constituted, consisting of three commissioners, etc. By subsequent sections, it is made the duty of the commissioners to examine the claims submitted to them, and to decide upon their validity, and rules are prescribed by which their decisions shall be governed.

The fourth section provides for the appointment of a law agent, whose special duty it shall be "to superintend the interests of the United States" in the premises, to attend the meetings of the board, to collect testimony in behalf of the United States, and to attend at the taking of depositions by the claimants; and no deposition is allowed to be read in evidence unless taken on notice in writing to the agent or to the district attorney, if the case is appealed to the district court. Other sections confer upon the district court jurisdiction to hear the cause de novo on appeal, and particularly prescribe the manner in which appeals shall be taken and the proceedings conducted; and finally the right of appeal to the supreme court is given to either party.

The final decrees rendered by the commissioners, or by the district or supreme courts, or any patent issued under the act, are, by section 15, declared to be conclusive between the United States and the said claimants, but shall not affect the interests of third persons.

The submission of their claims to the tribunal thus constituted was not left to the choice of the claimants.

By section 8, each and every person claiming lands by virtue of any right or title derived from the former governments of California, was required to present the same, together with the documentary evidence and testimony of witnesses relied on, to the board; and the thirteenth section declares that all lands, the claims to which shall not have been presented to the commissioners within two years after the date of the act, shall be deemed, held and considered as part of the public domain of the United States.

This act, although benevolently designed, has in its practical operation imposed a grievous, though perhaps unavoidable, burden upon the holders of Mexican titles in this state. They have been subjected to the expense and delay of a litigation which, after the lapse of more than twenty-five years, can scarcely be said to have terminated. To whatever criticisms the act of 1851 may be obnoxious, it certainly cannot be reproached for having failed to guard the interests of the United States in the amplest manner.

The appeals to the district court from the decisions of the board gave to both parties, in every case, the benefit of a trial de novo on the merits, with the unrestricted right to take further proofs. Six months were allowed to the party against whom the board had decided to determine whether or not the appeal should be prosecuted. From the decree of the district court an appeal was allowed to the supreme court, to be taken at any time within five years; and even when the cause had reached the supreme court, it might still be remanded for further proof, in case the evidence with regard to the validity of the claim was deemed to be unsatisfactory. U. S. v. Teschmaker, 22 How. [63 U. S.] 392; U. S. v. Pico, Id. 404; U. S. v. Vallejo, Id. 416; U. S. v. Cambuston, 20 How. [61 U. S.] 59.

Such were the means adopted by the political department of the government to enable it to discharge its treaty obligations with intelligence and justice. It, in effect, called to its assistance the courts, and for that purpose invested them with a jurisdiction in all respects special and extraordinary, and which, except for the act, they would not have possessed. Foster v. Neilson, 2 Pet. [27 U. S.] 314; U. S. v. Arredondo, 6 Pet. [31 U. S.] 742; Beard v. Federy, 3 Wall. [70 U. S.] 492.

The treaty is a contract made by the nation acting through the political branch of its government. Its execution is confided to that branch of the government alone. And until it has provided the means and ordained the mode of its execution, no court has authority to decide what cases fall

within its provisions, or what titles the United States is bound to respect. A fortiori must the ordinary courts be without jurisdiction, when the political power has confided the whole subject to special tribunals, whose final decrees it has declared shall be conclusive.

In the case of U S. v. Arredondo, 6 Pet. [31 U. S.] 742, Mr. Chief Justice Marshall says: "Should we be called on to decide on the validity of a title acquired by any Spanish grant not embraced by these laws (i. e., the laws of 1824 [4 Stat. 52] and 1828 [Id. 284], which conferred the special jurisdiction), we should feel bound to follow the course pursued in Foster v. Neilson, in relation to the stipulation in the eighth article of the Florida treaty, that the legislature must execute the contract before it can become a rule for this court."

It is urged that a court of general equity jurisdiction may take cognizance of this bill, because of the fraud it alleges.

The fraud principally relied on is the presentation to the board of certain documentary evidences of title, which the parties presenting them knew to be forged and antedated.

But these documents were presented to a tribunal created for the sole purpose of investigating and deciding upon their validity; and of this, genuineness was the first and indispensable element. The question, therefore, presented to this court on the allegation of fraud, is precisely the question presented to the board and to the district and supreme courts, and of which the act gave to those tribunals exclusive cognizance; and the maintenance by this court of its jurisdiction in this case involves the assumption of jurisdiction to review and reverse the final decisions of the board, the district and the supreme courts, on the very issues presented for their determination.

Nor is this all. The jurisdiction of this court is not claimed to exist by reason of its relation to the district court as a superior tribunal, nor because the law has committed to it any authority to pass upon titles of this description.

Its inherent jurisdiction as a court of general equity powers is alone appealed to. But if it derives its jurisdiction from that source alone, no reason is perceived why the attorney-general might not, had he seen fit, have invoked the same jurisdiction in any state court to which similar powers have been confided. And the anomaly might thus have been presented of a state court determining the rights and duties of the United States under a treaty, and reviewing and reversing the decision of the supreme court of the United States on a subject-matter of exclusively national concernment, and of which the political department of the national government or the tribunals of its selection have exclusive cognizance.

The provision in the act of 1851, which declares the final decrees of the board and of the district and supreme courts to be conclusive as between the United States and the claimants, has already been cited.

It will not be disputed that, if the allegations in this bill are sufficient to show jurisdiction, every case heretofore decided under the provisions of the act may be re-opened for examination in this court on its merits, whenever the attorney-general or those to whom he may delegate his authority consider themselves justified in alleging that false and fabricated documentary evidence of title has knowingly been presented.

Before this can be allowed, we must first deprive the clause in the act, which declares that final decrees made under its provisions shall be conclusive, of all significance and effect.

It is urged, however, that all final judgments of courts of competent jurisdiction are conclusive, and that the conclusiveness attributed by the act to final decrees in this class of cases is no greater than that possessed by other final decrees. All may be impeached for fraud; for "fraud vitiates the most solemn judgments."

The general proposition may be conceded, but the question recurs: Is the fraud charged in this bill such as a court of general equity jurisdiction can take cognizance of under the circumstances of this case, and such as will destroy the conclusiveness of the final decree in the former proceedings?

The validity of an alleged Mexican or Spanish claim depends upon the genuineness of the title-papers, and upon their legal effect as translative of title.

The first is the more difficult, and frequently the only point in controversy.

To deny the conclusiveness of the decree on the question of genuineness is to deny it on the principle point submitted for adjudication.

If Mexico, solicitous to secure the rights of its citizens in the ceded territory, had demanded of the United States what means the latter would adopt for their maintenance and protection; and the United States had stipulated in the treaty that the means should be those provided in the act of 1851, and had further declared that the investigation should be conducted as between equal litigants before a court of justice, and that the result of the inquiry should be conclusive of the rights of both parties—would it be compatible with good faith for the United States to contend that under these stipulations there was tacitly reserved to itself a right, not conceded to its antagonist, to re-open and re-examine before a tribunal not mentioned in the treaty the identical questions which it had agreed should be finally determined in another mode; and that it could do this at any time, however remote from the date of the final determination, and no matter how ample had been its opportunities for investigation, on the plea

that the statute of limitations does not run against the government, and that no laches can be imputed to a sovereign?

Could it maintain the true construction of the treaty to be that the final decrees of its tribunals adjudging grants to be genuine should be conclusive, provided the grants were genuine, and that that question it could always re-open before the ordinary tribunals?

It is believed that no representative of the political. department of this government would contend for such a construction of the treaty stipulation supposed; and a similar construction of identical provisions in an act of congress must be equally rejected by the court.

To accept it would be to make the title of the act, "An act to ascertain and settle private land claims in California," a misnomer, and the pledge that the result of the proceedings it directs shall be conclusive a delusion.

. By the treaty with Spain of February 22, 1819 [8 Stat. 252], the United States exonerated Spain from all demands in the future on account of certain specified claims of its citizens, and agreed to make satisfaction of the same to an amount not exceeding four millions of dollars. To ascertain the amount and validity of these claims, it was stipulated that a commission, to consist of three commissioners, etc., should be appointed "to receive and examine and decide upon the amount and validity of all claims included with the description mentioned."

With respect to the decisions of these commissioners, the supreme court says:

"The object of the treaty was to invest the commissioners with full power and authority to receive, examine and decide upon the amount and validity of the asserted claims upon Spain for damages and injuries. Their decision, within the scope of their authority, is conclusive and final If they pronounce the claim valid or invalid, if they ascertain the amount, their award in the premises is not re-examinable. The parties must abide by it as the decree of a competent tribunal of exclusive jurisdiction. A rejected claim cannot again be brought under review in any judicial tribunal. An amount once fixed is a final ascertainment of the damages or injury. This is the obvious purport of the language of the treaty." Comegys v. Vasse, 1 Pet. [26 U. S.] 212.

If we substitute for the word "treaty" in this extract the words "act of 1851," the language will admit of almost literal application to the case at bar.

The claims to be presented to the commission under the treaty with Spain were claims to indemnity for injuries. The claims to be presented to the board under the act of 1851 were claims to lands. In the former case, the treaty itself provided for the constitution of the commission. In the latter, the treaty stipulated in general terms for the protection of the inhabitants of the ceded territory in their rights of property, and an act of congress confided the duty of ascertaining those rights to a commission established by its own authority, with appeals to. the national courts. But these differences make no distinction in principle between the two cases.

The authority of the commission in the one case, and that of the board of commissioners and the courts in the other, are alike exclusive. And the awards of the one and the decrees of the other are alike conclusive of the rights of the parties. The assumption of a jurisdiction by a court of equity to re-examine final decrees made under the act of 1851 involves in principle the assumption of jurisdiction to re-examine all awards made by special commissions constituted under treaties with foreign nations.

Among the great number of claims to lands in the territories ceded to the United States by France and Spain. it is not to be supposed that many fraudulent titles may not have escaped the scrutiny of the tribunals appointed to determine their validity. It is a significant circumstance, that in no case, so far as the judicial history of the country informs us. has the United States, on discovering the fraud, attempted to cause the re-examination before the ordinary tribunals of a finally confirmed claim.

In the Case of Sampeyreac, 7 Pet. [32 U. S.] 222, which is the only reported case where a re-examination was made, it was done by virtue of a special act of congress, which authorized the proceeding, not before the ordinary tribunals, but by bill of review in the special tribunal upon which the original jurisdiction over the cause had been conferred. Whether or not by virtue of that jurisdiction it might have entertained a bill of review to set aside its own decree, the supreme court does not decide. An act of congress seems to have been deemed necessary to confer the authority. But it is nowhere intimated that any court of equity powers, but upon which no authority to pass upon the validity of claims of that description had been conferred, could have entertained such a bill, or in any other form have re-examined the questions finally decided by the special tribunal.

The case was one of admitted forgery. But it was nevertheless contended by counsel, that the decree of the court being conclusive between the parties, congress had no power to authorize the review, or to disturb vested rights. The supreme court, without passing upon the general proposition, overruled the objection, on the ground that Sampeyreac was admitted to be a fictitious person, and that, therefore, there had been no real parties before the court between whom the decrees could be conclusive.

The position taken by counsel in this case may, perhaps, be extreme and untenable. In deciding the case at bar. it is not necessary to assert that, where a fraudulent title has

been confirmed, the United States is entirely without remedy, nor that the political department of the government may not, if it sees fit, invest the courts with authority to re-examine the questions which, as the law now stands, remain finally decided in these cases. But, until congress has so expressed its will and conferred the requisite authority, it may confidently be affirmed that the ordinary tribunals are without jurisdiction.

The counsel for the United States has drawn a vivid picture of the avowed forger glorying in his crime, defying the justice he has duped, and demanding that the officers of the government shall, by issuing to him his patent, assist him in consummating his fraud.

In discussing a dry question of jurisdiction, such appeals are, perhaps, not quite appropriate. But, if the practical bearings of the questions to be decided are fit subjects for consideration, it may be observed that the question is not whether an admitted forger shall be allowed to enjoy the fruits of his crime (for the demurrer admits the truth of the allegations of the bill only hypothetically, and for the purposes of the argument), but whether every title in this state derived from the former governments shall be subjected to the ordeal of a new litigation whenever the attorney-general, or those who may obtain his ear by, it may be, false or interested representations, sees fit to allege in an unsworn bill that the documentary evidence on which the title rests is forged or antedated.

If, without the authority of congress, and on such representations, a cloud can be cast upon titles in this state, the effect would be little short of a public calamity. The repose of ancient possessions would be disturbed, and the security of titles, long since and after protracted litigation adjudged to be valid, would be menaced. A tremendous weapon of vexation, oppression, or extortion might be placed in the hands of unscrupulous persons, and the horde of professional witnesses which has so long infested the courts in this class of cases might resume their trade, and again find a market for their venal testimony.

Compared with evils such as these, the public benefits to be derived from the exposure of the few frauds which may have eluded the vigilance of the court or officers of the government would be insignificant.

It has not been thought necessary to enter into a detailed examination of the cases cited from the English and American reports which determine when and under what circumstances equity will relieve against a judgment obtained by fraud. The question before the court turns upon considerations so peculiar to itself that adjudged cases in England bear to it but a faint and remote analogy. None of them involve the question which is deemed the principal one in this case, and the correctness of the decisions in some may be open to doubt or discussion, "Nil agit exemplum litem quod lite resolvit." Perhaps the nearest analogy is that afforded in the case of a forged

will decided to be genuine by a probate court. Even in such a case the supreme court, following the English authorities, has held that equity has no jurisdiction to avoid the will or set aside the probate. Case of Broderick's Will, 21 Wall. [88 U. S.] 503.

In the ordinary course of proceedings in probate courts, the will is often submitted by the executor in the absence of the parties interested to contest its validity, and the time allowed the latter to intervene is necessarily short. But in cases submitted to the board, in the compulsory litigation which the act of 1851 required, the opposing party is in court demanding the investigation of the genuineness of the claim, and consenting in advance to be bound by the decisions of tribunals of its own appointment.

To relieve against a fraud effected by the forgery of a will, as of any other instrument, falls within the ordinary scope of the powers of a court of equity. Its jurisdiction is ousted because the law has given to another tribunal exclusive jurisdiction over the subject. But in the cases at bar the jurisdiction fails, not merely because congress has confided to other tribunals exclusive jurisdiction over the subject, but also because this court would have no power, even if such exclusive jurisdiction had not been vested elsewhere, to decide what are the rights and duties of the United States under the treaty, and to what cases its stipulations apply.

The cases of Johnson v. Towsley, 13 Wall. [80 U. S.] 91, and Niles v. Anderson, 5 How. (Miss.) 366, are much relied on by the counsel for the United States. On examination, they will be found to have no application to the case at bar.

In Johnson v. Towsley, and the succeeding case of Samson v. Smiley [13 Wall. (80 U. S.) 91, note], it was merely held that when a party is deprived of his right of pre-emption, otherwise perfect, by a mistake of law or fact on the part of the land department, equity will relieve, and, if a patent has been issued, control it in the hands of the patentee for the benefit of the party rightfully entitled.

In the case of Niles v. Anderson, it was held that where a person had fraudulently obtained from certain United States officers certificates to an Indian deed, which were necessary to give it validity, equity would restrain him from prosecuting an ejectment suit founded on the deed against a party in possession holding under a prior equitable deed from the same Indian. It is obvious that these authorities throw no light upon the question of the conclusiveness of a final decree of confirmation under the act of 1851, or on that of the jurisdiction of this court, as a court of equity to set aside those decrees, or enjoin against their use. Where in the course of a proceeding before a court having jurisdiction of the subject-matter of the controversy, a judgment is set up as an estoppel, and conclusive of the rights of the parties, its effect may be avoided by proving that it was pro-

cured by fraud and collusion. Such was the celebrated Case of the Duchess of Kingston, in which it was decided that a judgement obtained by fraud would not stand in the way of prosecution for bigamy—that the suit in the ecclesiastical court was a contrivance merely —a link in the chain of fraud and in truth no judgment—according to the phrase used by Lord Loughborough: "Fabula non judicium hoc est. In scena non in foro res agitur.

But here the jurisdiction of the house of peers to try the defendant for the crime of which she was accused, was undoubted. The judgment of the ecclesiastical court was relied on as judicially establishing that the alleged first marriage had not been contracted. The judgment was disregarded because it had been collusively obtained in a sham suit.

But in suits at bar there is no subject-matter of which the court has jurisdiction, in the trial of which the validity of the decrees now assailed is questioned collaterally or incidentally. The very object and prayer of the bills is to obtain a decree declaring the original grants fraudulent and invalid, the lands covered by them to be public lands of the United States, and that the decree of confirmation be annulled and set aside. In the brief filed by the counsel for the United States, he has disclaimed all right to demand the greater part of the relief prayed for in the bills. But he insists upon the right to a decree enjoining those defendants from availing themselves of the decree of confirmation, and from suing out a patent. He admits that as to innocent parties who may have purchased since the final decrees of confirmations, the decrees will stand, and he suggests that they may even obtain patents for their lands, in their own names or in those of the guilty defendants.

But this change in the form of the relief demanded leaves the force of the objections to it unimpaired. Before the court can grant it it must first pass upon the genuineness and validity of the original grants—a subject over which, as has been shown, it has no jurisdiction. In truth, stripped of all disguises, these proceedings are in effect appeals to this court from the decisions of the special tribunals, or they are bills of review to set aside the decrees for newly discovered evidence, and the allegations of fraud, which are supposed to give jurisdiction to the court, only reveal more clearly the true nature of the suits.

It is believed that the foregoing conclusively shows that this court has no jurisdiction to inquire into the fraud principally relied on, because:—

1. The inquiry would involve a re-examination of the very question, exclusive jurisdiction to decide which, has been confided to other and special tribunals;

2. Because the decisions of those tribunals are declared by law to be conclusive of the rights of the parties;

3. Because even if no such jurisdiction had been confided to special tribunals, this court would be without authority under its general equity powers to determine what cases fall within the protecting clause of the treaty, or when and in what mode the political department of the government should fulfill its treaty stipulations.

But waiving for the moment all considerations arising out of the special circumstances of this case, let us briefly examine the more general positions assumed by the counsel of the United States. It is in effect contended that where a party has been forced to commence a suit to establish the genuineness of a document, and the suit is tried on that issue, his adversary may omit to bring forward proofs of its fraudulent character which are in his own possession, and which by reasonable diligence he might have produced; and afterwards, when judgment has gone against him, may ask a court of equity to set aside that judgment and retry the same issue, not on the ground of newly discovered evidence which could not by reasonable diligence have been procured, nor on the ground of fraud practiced in the course of the proceedings, but on the allegation that the document adjudged to be genuine was in fact fraudulent, and that he believed in and was misled by the assertion of its genuineness made by his antagonist. And further, that this belief in the assertions of his adversary should excuse him for his laches in not producing proofs of the fraud in his own possession on the trial of the suit which he has himself compelled his adversary to bring to determine that very issue.

A statement of this position is its own refutation. It is believed that a bill to set aside a final judgment, and to obtain a new trial on such grounds and with such an excuse for laches, would be dismissed by a court of equity without hesitation. On the point whether laches with which a private party would clearly be chargeable, can in this case be imputed to the United States, some suggestions will hereafter be offered.

Again: the allegation in the bill chiefly relied on is, that certain title-papers were forged. But the same bill avers that they have been adjudged to be genuine by a court of competent jurisdiction in a proceeding instituted to try that very question. While that judgment stands, they are in legal contemplation genuine. The proceeding on which they were so adjudged was in the nature of a proceeding in rem to determine the status of the property as public or private land; and the decree, until set aside, "renders the fact what the court adjudicates it to be." 2 Smith, Lead. Cas. 498. It is true that a decree may be avoided by showing that it was obtained by fraud. But there must be fraud in its concoction, such as collusion between the parties, or other circumstances which would establish that what seemed a decree was, in fact, no decree—that it was fabula non judicium. It cannot be shown by re-examining on its merits the very question decided by the decree.

To meet this exigency, the draughtsman of the bill has introduced some allegations, apparently intended to make out a case of fraud used in obtaining the decree, or in its concoction, that is, of collateral fraudulent acts extrinsic to the merits of the cause.

It is alleged that the defendants fraudulently suppressed and concealed from the board the grants for the ranchos of San Antonio, Pinole, San Pablo, Moraga, and Valencia, with intent to conceal from the board and the law agent of the United States the fact, which their production would have disclosed, that two of them were not granted until subsequently to the pretended sobrante grant. On this allegation it is to be observed:

1. That the fact alleged to have been concealed would have been wholly inconclusive if not immaterial. It is well known that in many cases ranchos were established and occupied under permissions to occupy or other provisional titles, and the rights of their owners recognized by the government in subsequent grants of adjoining lands, long in advance of the issuance of the final title. In some cases, the final title was never asked for nor obtained. A notable instance of this is found in the case of Alviso, whose claim was confirmed by the supreme court, on the strength of a permission to occupy, and a very ancient possession. [U. S. v. Alviso] 23 How. [64 U. S.] 318.

2. The documents alleged to have been suppressed were then and have ever since remained in the archives. They were, therefore, in the exclusive possession of the United States.

The allegation is thus, in effect, that the defendants concealed documents among the public records of the country, and suppressed them while in the exclusive possession of their adversary.

3. The very nature of the defendants' claim being for a sobrante resulting from the grants of certain specified ranchos, by inevitable reference directed the attention of the board and of the law agent to those grants, and rendered necessary an inquiry into the fact of their existence and their extent before the merits of their own claim could be determined.

4. The records of the board and of the district court show that in fact every one of these grants had been presented to the board for confirmation more than two years before the date of the decree in this case, and that all had been confirmed some months previously to that date, except one, which was subsequently confirmed on appeal by the supreme court.

But, even if the alleged fraud were undeniably such as would ordinarily vitiate a judgment for fraud in obtaining it, as in cases where the judge is interested or there has been collusion between the parties in a pretended, and not a real suit, fraudulent suggestions that the parties to the suit were before the court contrary to the fact, and the like, the complainant could not in this proceeding obtain the relief prayed for.

It is not enough that fraud in obtaining the decree be proved. The propriety of the decree must still be investigated (Story, Eq. Pl. § 426); in other words, the validity of the claim. The fact that a fraud in procuring the decree has been committed does not convert the land into public land of the United States, nor does the law punish such practices on the part of the claimant by a forfeiture of his estate. If the land was in fact private land at the acquisition of the country, the United States has not been injured by the fraud, however gross. Before, therefore, the court can declare the land to be public land, the validity of the claim must be investigated. And that question congress has conferred upon this court no power to determine.

If it be said that this court may set aside the decree, and restore the parties to their former situation, as is the practice of courts of equity (Story, Eq. Pl. ubi sup.), the answer is that that is impossible. For the board which made the decree has ceased to exist, and the act of congress confers no power on the district or supreme court to entertain bills of review to set aside their decrees in this class of cases; and, even if this fact were otherwise, it would be conclusive to show that the relief now prayed for must be sought in those courts, and not in this.

It is contended on behalf of the United States that the statute of limitations does not run against the government, and that laches cannot be imputed to it. The bill, however, alleges various facts in apparent excuse or explanation of any laches of which the government may have been guilty.

Whether these matters, if true, would constitute a valid excuse, and whether their truth is consistent with notorious facts disclosed by the records of the board, and of the district and supreme courts, and by the judicial history of the country, it is not necessary to inquire.

Nor is it necessary to determine whether the general principle that laches cannot be imputed to the government applies to cases of this nature. It may, however, be suggested as worthy of consideration, whether, if the act of 1851 be construed as tacitly reserving to the United States the right to reexamine and reverse in other tribunals the decrees which that act declared should be conclusive, the second proceeding should not be regarded as a part of, or a sequel to, the first, and that in it, as in the first, the United States has consented to be bound by all the rules which control the rights of equal litigants before a court of justice. It may also be suggested whether it is not a fundamental and inherent principle of the court of equity, at whose hands relief is

now sought, to refuse to interpose in behalf of stale demands, not because they are barred by the statute of limitations, nor because laches can be imputed to the complainant, but because from the lapse of time and the nature of the case it is probable that justice cannot be done. If this be the true ground of the refusal of equity to interfere in such cases, no distinction can be drawn, between suits by the government and those brought by private persons. The ascertainment of the truth may be as impracticable in the one case as in the other. If this principle be applicable to any case where the government is a party, it would seem to be so to the case at bar—so far at least as the allegations of the bill are to be proved by oral testimony.

The grant, if genuine, was made in 1841, more than thirty-five years ago, when the country was sparsely inhabited, and knowledge of the transactions was necessarily confined to a small number of persons. To establish the genuineness of the grants, the claimants would have to depend upon the survival of these witnesses after so long a period, the accuracy of their memories, and their willingness under great temptation to speak the truth. They would labor under disadvantages nearly as great when called on to meet testimony in support of the allegation that the grant was fabricated in 1851.

But it is unnecessary further to consider this point, for I am of opinion that the objections to the jurisdiction would be insuperable, even if these bills had been filed on the very day on which the decrees of confirmation became final.

It is objected that the attorney-general has no authority, by virtue of his office, to commence this suit in the name of the United States. The court is not unmindful that the decision of the question whether the highest law officer of the government has exceeded the limits of his official authority involves grave and delicate considerations. In the view taken of the other questions discussed in this opinion, it is unnecessary to decide it.

But it may be remarked that the institution of these suits seems to commit the United States to a course of proceeding, and to the assertion of supposed rights in a case where it must be admitted that the political power has the exclusive right to determine what shall be the attitude of the government with regard to the claims, and whether this is an appropriate and expedient mode of asserting its rights and performing its obligations under the treaty. If all the titles of this state derived from the former governments were subjected to an indiscriminate attack, like that in the case at bar, diplomatic remonstrance or political complications might result, and the government might be compelled reluctantly to adopt or formally to disavow proceedings, on the propriety of

taking which the political branch of it had never been consulted.

The relation of the attorney-general to the United States is not wholly dissimilar to the ordinary relation of attorney to client. That client is in these cases the legislative branch of the government, whose exclusive province it is to determine when and how the political obligations assumed by the nation shall be fulfilled. Until authority is given by that branch of the government, it may be doubted whether the general authority of the attorney-general to represent the United States in ordinary litigations is sufficient to enable him to institute suits like those at bar.

It will not be disputed that congress had the exclusive right to adopt any means it thought fit to ascertain and discharge its treaty obligations, whether by committees of congress, special commissions, or by invoking the aid of the regular national tribunals. If, before congress had taken any action on the subject, the attorney-general being of opinion that certain alleged titles were fraudulent, or so inchoate and incomplete that the claimants had no right of property which the treaty protected, had instituted ejectment suits in the name of the United States against the parties in possession, might it not be urged that he had no more authority to commence the suits than the court would have jurisdiction to try them? And may not the same objection be urged when, after exhausting the ample powers with which he is invested by the act of 1851, he commences, without the direction of congress, an analogous proceeding to attain the same object?

The force of these objections is not diminished by the consideration that, from the necessities of his position, the attorney-general is unable personally to examine into the merits of every suit that may be brought, and that he is forced to delegate the authority to use the name of the United States, in form, to the district attorney, but in fact to special counsel, who, in the cases at bar, has given bonds to pay the expenses of the litigation, and who may smite or spare or threaten any title in this state, at his discretion; or, assuming him to be actuated by the highest motives, according to the conclusion he may on investigation reach, as to the propriety of the final decree of the board, the district or the supreme courts, adjudging the title to be genuine. If this power should by chance fall into unworthy hands, it might afford the opportunity for enormous abuses.

It is objected that the bill is unsworn. If, however, the suit is properly brought in the name and by the authority of the United States, verification of the bill is unnecessary. But it may be observed that if the attorney-general has thought it his duty to authorize these proceedings, it would have been far more satisfactory to the court if the allegations of these unsworn bills had been au-

thenticated by his own signature, affixed to them under the sanction of his personal and official character, and not merely by those of the district attorney, whom he has ordered to bring the suit, and of the special counsel, to whom he has delegated his authority. An assurance would thus have been afforded of the attorney-general's belief in the allegations in the bills, and in the existence of rights on the part of the United States which the bills seek to enforce; that the suits are really, and not merely nominally, brought by the United States to protect its rights, and not merely to promote the interests of private individuals or corporations; an assurance somewhat weakened by the circumstance that the attorney-general seems to have considered the rights of the United States so doubtful, or its interest so unimportant, that he has directed the district attorney to commence these suits "on the giving, by the said John B. Howard, security for, or depositing a sufficient sum to defray, all expenses which may be incurred in said legal proceedings." Bonds have accordingly been given by John B. Howard, special counsel for the United States, which contain the recital just quoted.

The lands covered by the grants in these cases are many thousand acres in extent. The bills pray that they may be adjudged to be public lands of the United States. It is not to be supposed that, if the attorney-general were persuaded that so large and valuable a property belonged to the United States, he would have made the assertion of its rights to depend upon the willingness or ability of private individuals to defray the expense of the litigation. The bill filed in the case of U. S. v. Throckmorton contains the following extraordinary "notice":

"And the said district attorney, in behalf of the United States, hereby gives notice that, in the event of a decree of this court that the said grant was false and invalid, and that the said confirmation thereof was obtained by fraud, and that the said grant and confirmation be annulled and set aside, * * * and the said lands are public lands of the United States, that the 'United States will in such case waive all her right and claim to that portion of said lands on which the town of New Saucelito is located, and also that portion of said lands on which the town of Old Saucelito is represented, as represented on said Exhibit A.'"

"The area and quantity" of these lands is stated not to exceed six hundred and forty acres. To whom this relinquishment of the title of the United States to a large and valuable tract of land is to be made, on what grounds, and by what authority, the bill does not state. It will surely not be claimed that the attorney-general, or his representative, has not only the right, by instituting these proceedings, to cloud every title in this state with the menace of a litigation, but also that he can waive, at his discretion, the rights of the United States to lands adjudged to be public lands. The power to donate the property of the nation is elsewhere vested.

The conclusions embodied in the foregoing may be summarized as follows:

The demurrer must be sustained because:

1. This court has no jurisdiction to determine the genuineness and validity of a Mexican land claim, that jurisdiction having been exclusively vested in other and special tribunals.

2. The final decrees of those tribunals are declared by law to be conclusive, not merely as concluding the litigation, but conclusive of the rights of the parties.

3. Even if no such exclusive authority had been conferred on the special tribunals, this court would have no jurisdiction to determine how the political department of the government shall fulfill its treaty stipulations, or to what cases those stipulations apply; and especially in cases where the grants are inchoate.

4. A court of equity cannot interfere to set aside a judgment for fraud in procuring it, when the fraud alleged is the presentation to the court in which judgment was obtained of false documents, and the sole or principal issue tried by that court was upon the genuineness of the documents so presented.

5. The allegations of fraudulent concealment and suppression, which might, if the allegations were true, be deemed to constitute "fraud in procuring the decree," are shown by the bill itself, and the nature of the documents alleged to have been concealed, to be destitute of foundation in fact.

6. That even if the bill showed that the decree had been procured by fraud of the grossest character, this court would still be without jurisdiction; for it has no authority to pass upon the propriety of the decree, i. e., to decide upon the validity of the claim, nor to remand the parties to any other forum where that question may be determined.

SAWYER, Circuit Judge, concurring. While the courts of California, state and national, are not unaccustomed to deal with cases of great magnitude, I deem it not too much to say, that no question has ever been presented in this state, so far-reaching in its consequences, as that involved in these cases, if the bills filed can be maintained. It is a startling proposition to those who hold patents to lands issued upon confirmed Spanish or Mexican grants, that after twenty-five years of compulsory litigation, intended, in the language of the various acts of congress, to "settle titles to land in the state of California," the holders of all such patents are liable to be called upon to relitigate their claims with the government in the ordinary courts of justice; and that the patent, instead of being conclusive evidence of a "settlement" of the title— the end of litigation—is but the foundation for the beginning of a new contest to unsettle it, in the tribunals of the country, which before

had no jurisdiction whatever over the subject-matter. The very institution of these suits, in the name and by the authority of the government, was well calculated to produce, and, undoubtedly, did produce, a general distrust of such titles, and a widespread, if not a well-founded, alarm. If this court has jurisdiction of the subject-matter as now presented, and the bills filed present proper cases for its exercise, we are undoubtedly bound to entertain them, and adjudicate the matters at issue according to their real merits, as they may finally be made to appear. But I am fully persuaded that these cases are not of a kind to justify the assumption of a doubtful power, or the sustaining of bills which present but doubtful, as well as stale, equities.

Profoundly appreciating the importance of the principles involved in this discussion, and the grave responsibility resting upon the court in their adjudication, I have carefully considered the elaborate arguments of counsel, both oral and printed, and examined the numerous authorities cited, not merely with an earnest hope. of reaching a correct solution of the questions presented, but with a desire, and a purpose, to present my own views in a separate opinion. I regret to say, however, that, since the argument, I have been constantly pressed by other official duties, which, together with the time necessarily consumed in a thorough examination of the questions argued, have thus far prevented the accomplishment of that purpose. But upon a full consideration of the opinions of the presiding justice and the district judge, I find that they have so thoroughly, and so satisfactorily, discussed the questions submitted, that I cannot hope to add anything to the force of their reasoning. I, therefore, with less regret, without further delaying the decision, content myself with expressing my entire concurrence in the conclusions reached, in the grounds upon which the decision is rested, and in the line of argument by which they are so conclusively maintained.

It is apparent to my mind, that it is impossible to maintain these bills without going behind the patents and decrees of confirmation, and re-examining the question as to the genuineness of the grants—the very question, the determination of which was exclusively committed to another tribunal; and which that tribunal, in a proceeding wherein the genuineness of the grants was the controlling question directly in issue, examined and adjudicated. To maintain that this court can re-examine that precise question, is to maintain the proposition, that a court may have exclusive jurisdiction of a matter over which another tribunal has concurrent jurisdiction—a proposition as impossible in law, as that in physics two bodies can occupy the same space at the same time.

But, conceding the jurisdiction, the matter is res adjudicata under the ordinary rules of law. The difficulty cannot be avoided by saying that the subject-matter now involved is fraud, and fraud vitiates all proceedings; for the fraud relied on, when we come to the substance of the cases presented, consists in presenting and maintaining fraudulent grants, without disclosing the falsity of the claim to the adverse party; but that is the very fact before in issue, litigated and determined, and not a fraud practiced upon the court in the course of the litigation, by which a real litigation was prevented, as distinguished from the fraud which was itself the subject matter of the litigation. If these bills can be maintained, it would be impossible to present a case wherein a question of fraud constitutes the real question in issue litigated between real parties before the court, and determined, to which the wholesome doctrine of res adjudicata would apply. Under such a rule, every case in which a false claim has been presented, and the question of genuineness litigated and adjudged, would be open to re-examination on the pretense of fraud, and there would be no end to litigation. If the principle maintained by the claimants can be extended to these cases, the doctrine of res adjudicata might as well be abolished.

[NOTE. Subsequently the case of United States v. Throckmorton and others was taken, on an appeal, to the supreme court. where the decree of this court sustaining a demurrer to the bill and dismissing it on the merits was affirmed. 98 U. S. 61.]