UNITED STATES *v.* HANCOCK and others.

*(Circuit Court, N. D. California.* May 2, 1887.)

1. PUBLIC LANDS—PATENTS—MEXICAN GRANTS—FRAUD.

In the absence of satisfactory proof of fraud in procuring the survey, or its approval, or the issue of the patent based upon it, where the decree of the board of land commissioners created by the act of congress of March 3, 1851, confirming a Mexican grant is for a tract of land with designated boundaries, and not for a specific quantity, a patent based upon a survey following the boundaries of the decree is not void because it embraces a tract containing more than 30,000 acres, or very nearly 7 Mexican leagues, and the grant is for 1 square league and no more.[1]

2. LIMITATION OF ACTIONS—SUITS BY UNITED STATES—PUBLIC LANDS.

A suit to set aside a patent issued to one claiming land in California under a Mexican grant on the ground of fraud, cannot be maintained by the United States after the lapse of 19 years since the survey was made, 15 since the patent was issued, and 36 since the passage of the act of congress of March 3, 1851, entitled, "An act to ascertain and *settle* private land claims in the state of California." Such a suit is part of the compulsory litigation forced upon claimants by that act; and, as the government consented to appear therein as an equal litigant, and impliedly waived all rights peculiar to it as a sovereign, the maxim, "*nullum tempus occurrit regi,*" does not apply.[2]

In Equity.

*S. G. Hilborn,* U. S. Atty., and *Shirley C. Ward,* for complainant.

*James F. Stuart,* (*Barclay & Wilson,* of counsel,) for respondents.

Before SAWYER and HOFFMAN, JJ.

HOFFMAN, J. This is a suit brought in the name of the United States to vacate and annul the patent issued June 22, 1872, to Michael White,

---

[1] As to the conclusive effect of patents for land issued by the public land-officers, see Butte City Smoke-House Lode Cases, (Mont.) 12 Pac. Rep. 858; Plummer v. Brown, (Cal.) Id. 464, and note; but as to the power of a court of equity to vacate the action of officers imposed upon by fraud, mistake, or false swearing, and to revest the title to public lands which has been thus wrongfully obtained, see Wilson v. State, (Ark.) 1 S. W. Rep. 71; Sanford v. Sanford, (Or.) 13 Pac. Rep. 602; U. S. v. Maxwell Land-Grant Co., 7 Sup. Ct. Rep. 1015.

[2] Respecting the running of the statute of limitations against the United States, see U. S. v. Spiel, 8 Fed. Rep. 143; note to Traer v. Clews, 6 Sup. Ct. Rep. 170.

confirmee for the Muscupiabe *rancho* in San Bernardino county, state of California. The bill does not deny the genuineness and validity of the original Mexican grant to Michael White; but it alleges that the grant was for one square league and no more, and that the patent issued embraces a tract containing more than 30,000 acres, or very nearly seven Mexican leagues. It further alleges that this erroneous location was fraudulently and intentionally made by one Henry Hancock, the United States deputy surveyor, who made the survey upon which the patent is based, and who at the time of making such survey was a secret owner of an undivided half interest in the *rancho*, and was at the same time the agent of the other owners thereof, and by them intrusted with all matters concerning the location of the grant; that said location was made for the purpose of defrauding the United States out of, and corruptly gaining for himself and his co-owners, some 26,000 acres more than they were by law entitled to; and that Hancock, by false and untruthful representations made to the United States surveyor general for California, deceived that officer, and procured the final confirmation of the survey upon which the patent was founded.

With respect to the allegation that the original grant was for a league and no more, it is sufficient to say that the decree of confirmation makes no mention of quantity, but confirms the claim to a tract, the boundaries of which are specifically mentioned. That decree, made March 6, 1855, has become final. This court has no jurisdiction to correct any errors which may have been committed in final decrees of confirmation of Mexican land claims in California, whether those decrees have been made by the board of land commissioners, the district court, or the supreme court of the United States. Whether the alleged error of those tribunals consists in confirming an invalid claim, or in the designation of the boundaries of a confirmed grant, is immaterial. In either case, the decree is final and conclusive, unless such fraud be shown as will vitiate the most solemn judgments.

That it was within the province of the board, in proper cases, to declare the boundaries of confirmed grants, has frequently been decided by the supreme court. *U. S.* v. *Sepulveda*, 1 Wall. 104. A final decree, giving the boundaries of the tract confirmed, "is conclusive not only on the question of title, but as to the boundaries which it specifies." *U. S.* v. *Halleck*, 1 Wall. 439, 440; *U. S.* v. *Billing*, 2 Wall. 444; *Higueras* v. *U. S.*, 5 Wall. 827.

In *U. S.* v. *Halleck*, the supreme court says:

"The answer to all efforts of this kind is that the decree is a finality not only as to the question of title, but as to the *boundaries which it specifies.* * * * If erroneous in either particular, the remedy was by appeal, but the appeal having been withdrawn by the government, the question of its correctness is forever closed."

The final decree of the board is as follows:

"In this case, on hearing the proofs and allegations, it is adjudged by the commission that the claim of the petitioner is valid, and it is therefore decreed that his application for a confirmation be allowed, with the following

boundaries: On the north and east by the foot of the mountains, on the south by the Agua Caliente, and on the west by the Cotton woods, which are on the other side of the creek, reference being had to the map accompanying the *expediente.*"

It will be noted, that this decree contains no mention of quantity. It is a confirmation of a claim to a tract of land with specified boundaries. No suggestion is made that it was obtained by fraud. It is therefore final and conclusive.

How far the attorney general, in granting the use of the name and prerogatives of the United States, for the institution of this suit, was influenced by the assertion, so strenuously made at the bar, that the decree was, or ought to have been, for one league, and no more, we are not informed. We cannot assume that it had any weight with him, for that would be to suppose either that he never read the decree, or that he was not aware that, in the absence of fraud, it was final and conclusive.

The fraud alleged in this case is fraud on the part of the surveyor in locating the land, so as to include more than one league, and in designating and fixing the boundaries. The first of these accusations must be summarily dismissed. The surveyor was bound to survey and locate the land according to the decree. He had no authority to interpolate into it a limitation as to a quantity of which it makes no mention. The fraud, if any, committed by him, could only have consisted in corruptly adopting boundaries other than those called for by the decree.

No jurisdiction has been conferred on this court to correct any alleged errors on the part of the land department, committed in the final survey and location of Mexican land grants in California. *U. S.* v. *Flint,* 4 Sawy. 61, per Mr. Justice FIELD, affirmed in 98 U. S. 61, 66; *U. S.* v. *San Jacinto Tin Co.*, 10 Sawy. 643, 23 Fed. Rep. 279.

The act of June 14, 1860, conferred on the district court extensive powers over this subject, and under its provisions the plat and survey, when finally approved, had the force of a patent. This act was repealed by the act of July 1, 1864, which transferred the jurisdiction theretofore vested in the district court to the land office at Washington, and the secretary of the interior, on appeal.

It has frequently been held by the supreme court "that the decision of a proper officer of the land department is in the nature of a judicial determination of the matter in dispute." *Vance* v. *Burbank,* 101 U. S. 514. And in *U. S.* v. *Minor,* 114 U. S. 243, 5 Sup. Ct. Rep. 840, the court observes: "It has been often said by this court that the land-officers are a special tribunal of a *quasi* judicial character, and their decision on the facts before them is conclusive." But in cases where the proceedings have been "wholly *ex parte,* no contest, no adversary proceedings, no reason to suspect fraud, but where the patent is the result of nothing but fraud and perjury, it is enough to hold that it conveys the legal title, and it would be going quite too far to say that it cannot be assailed by a proceeding in equity, and set aside as void, if the fraud is proved and *there are no innocent holders for value.*" *U. S.* v. *Minor, ubi supra.*

These rulings and observations of the supreme court were made with

reference to patents issued under the general land laws of the United States. They apply with additional force to surveys and locations, and patents issued under them, by the land department, which has, by special legislation, been adopted as the instrumentality by which the location and boundaries of confirmed Mexican land grants shall be finally determined, and the means by which the political obligations of the government under the treaty shall be discharged. And especially in view of the fact that the jurisdiction given to the department was transferred to it from the district and supreme courts, to whom it had previously been confided.

It is plain, therefore, that the relief prayed for in this case can only be granted upon proof of such fraud practiced upon the land department as will render its decision a mere nullity, and will justify the application to its final judgment of the phrase, "*Fabula non judicium est; res agitur in scena noni, in foro;*" that it was a farce, not a judicial decision, performed on a stage, not in a court of justice. But even in that case the power of the court would be limited to setting aside the judgment of the land department, and annulling the patent issued in pursuance of it. It has no jurisdiction to determine how the new survey shall be made.

What is the nature of the frauds for which, under the maxim, "Fraud vitiates the most solemn contracts, documents, and even judgments," the latter will be set aside, has been fully expounded by Mr. Justice FIELD in *U. S.* v. *Throckmorton*, by the supreme court in the same case on appeal (98 U. S. 65,) and by the supreme court in *U. S.* v. *Minor, ubi supra.*

In *U. S.* v. *Throckmorton*, Mr. Justice MILLER gives at some length instances where courts of equity have entertained bills to set aside and annul the former judgment or decree, and open the case for a new and fair hearing. He observes:

"In all these cases, and many others which have been examined, relief has been granted on the ground that by some fraud practiced directly upon the party seeking relief against the judgment or decree, *that party has been prevented from presenting all of his case to the court.* * * * On the other hand, it is equally well settled that the court will not set aside a judgment because it was founded on a *fraudulent instrument or perjured evidence, or for any matter which was actually presented and considered in the judgment assailed.*"

Before proceeding to consider whether the proofs in the case show any such fraud practiced on the land department as will, under the principles above enunciated, authorize the court to set aside its "*judicial determination of the matter in dispute,*" an account must be given of the proceedings subsequent to the final decree of confirmation, which resulted in the approval of the survey and the issue of the patent. The decree of confirmation bears date March 6, 1855. The final survey under that decree was made by Henry Hancock in November, 1867. "It was published under the act of July 1, 1864, and remained in the surveyor general's office for a much longer time than required by law, without objections being filed thereto, as certified by the surveyor general." The sur-

veyor general approved the survey July 11, 1868, and it was forwarded to the general land-office for patent. The difference in area between the land included in the survey and the "one league, a little more or less," petitioned for, attracted the attention of the office, and the case was on the eleventh of May, 1870, referred to the department of the interior for instructions. On the twenty-fourth day of January the department advised the land-office that the survey did not conform to the decree of confirmation, disapproved and set it aside, and the twentieth May following ordered that the surveyor general be directed to cause a new survey to be made. The surveyor general of California, to whom this order was issued, was James R. Hardenburgh, who had succeeded Sherman Day, who was the successor of Lauren Upson, by whom the survey had been originally approved. On receipt of this order Mr. Hardenburgh, acting apparently under the provisions of section 10 of the act of March 3, 1853, deputed "a confidential agent," Mr. R. C. Hopkins, to make a personal examination of the land, and report upon the correctness of the survey and its conformity with the calls mentioned in the decree. Mr. Hopkins made his examination in November, 1871, accompanied and assisted by William P. Reynolds, a surveyor and civil engineer, who had resided 20 years in San Bernardino county, and was well acquainted with the land and the natural objects called for in the decree. On learning the results of Mr. Hopkins' examination, the surveyor general reported to the department that a survey made in strict accordance with the boundary calls of the decree of confirmation would include "something like a league more of land than the present survey." And he recommended that as the owners were satisfied with the survey already executed, that it be approved. On the thirteenth June, 1872, the secretary of the interior adopted this suggestion, and ordered that the survey be approved, and that a patent issue, "the patent to be given and accepted as a full satisfaction of all claims and right in the premises." The patent was issued June 22, 1872.

The foregoing account of the proceedings preliminary to the issue of the patent is (except what relates to Mr. Hopkins' appointment and report) taken from the land-office report for 1885.

It also appears from the documents, certified copies of which have been obtained from the land-office, that the case was carefully examined and considered, by successive officers of the department.

The letter of Mr. Delano, secretary of the interior, states that the survey was originally submitted to the department for instructions, not because it was supposed not to conform to the final decree, but because the tract embraced in the survey was so much larger than that asked for in the original petition, that the commissioner was unwilling to assume the responsibility of approving it.

The question thus presented appears to have been fully considered by the then secretary. A brief or argument was furnished by Mr. Montgomery Blair, in which that gentleman calls the attention of the secretary to the provisions of section 7 of the act of 1864, (13 U. S. St. 334,) which in unmistakable terms make it the duty of the surveyor general

to follow the decree  *  *  *  whenever such decree designates the specific boundaries of the claim, and which also make it the duty of the commissioner of the general land-office to require a substantial compliance with the directions of this section before approving any survey and plat forwarded to him.   The survey remained before the secretary unacted upon for nearly six months.   His succsssor, Mr. Delano, seems to have recognized the force of Mr. Blair's suggestions.   But he directed a further examination to be made, to ascertain whether the boundaries adopted in the survey conformed to the decree.

On the twenty-third January, 1871, Stephen J. Dallas, principal clerk of surveys, reported to the secretary that "upon a thorough examination of the papers handed over to me, herewith returned, and on comparison instituted between the official survey and the *diseno* representing the specific boundaries of the claim as confirmed by the board of commissioners, I find that the official survey executed by Henry Hancock does not conform to the boundaries as shown by the *diseno* and the decree of confirmation."   The report proceeds to indicate in detail wherein the non-conformity consisted.   It states that on the western side about seven square miles of adjacent public lands are improperly included in the survey.   On the other hand, non-conformity with the decree is indicated by the failure to include within the survey "an area of about ten square miles, to which the grantee would seem to be entitled by virtue of the final confirmation and the provisions of section 7 of the act of July 1, 1864."   On this report the secretary ordered a new survey to be made.   But on being advised, as above stated, by the surveyor general of California that a survey made in strict conformity to the decree would embrace a much larger tract than that included in the Hancock survey, and that the claimants were willing to accept that survey in satisfaction of all claims, the secretary ordered its approval, and that a patent issue.

I have thus recounted, with perhaps unnecessary minuteness, these proceedings, protracted through nearly four years, which resulted in the final determination by the tribunal appointed by law to decide them, of the questions now sought to be reopened in this court.   It will be seen that the case utterly fails to fall within the principles which, as the supreme court has decided, govern courts of equity, when asked to set aside a judgment for fraud.   No fraud has in this case "been practiced upon the party seeking relief against the judgment or decree, whereby that party has been prevented from presenting all of his case to the court." On the contrary, the case was fully presented, rigorously investigated, maturely considered, and finally decided, upon the same facts as those upon which this court is now asked to set aside the decision *"for fraud."* It is not even suggested that the land department was deceived by fraudulent documents or perjured testimony, and even if proved it would have afforded no ground for the relief prayed for.   *U. S.* v. *Throckmorton, ubi supra.*

It may, we think, be justly said that the case really presented is an attempt to procure the reversal or modification by this court of a final

decree of the board of commissioners, not in any way impeached for fraud, but objected to after the lapse of more than 30 years as erroneous. Had the true object of this proceeding been stated in the bill, it would have been summarily dismissed on demurrer. The effort to induce the court to correct alleged errors in the survey and location of the tract must prove equally futile. The foregoing observations are sufficient to indicate the grounds upon which we decide this case.

But, as the bill professes to be founded on frauds perpetrated on the government, some notice of the alleged frauds, and the evidence adduced to establish them, may not be inappropriate. It is alleged that Henry Hancock was a secret part owner of the land, and that to promote his own interests and those of his brother, and other co-owners, he fraudulently included in the survey more than one league of land, etc. The wantonness and absurdity of this accusation has already been shown. He was bound by law to survey the land according to the terms of the decree. There is no proof that, at the time of the survey, he had any interest in the land, secret or avowed. There is no proof whatever that his field-notes and plat of survey were not entirely correct, and afforded the means, when compared with the calls of the decree and the delineation on the *diseno*, of deciding upon the correctness of the survey. If he committed any error, it was, according to the report of Mr. Dallas, chief clerk of surveys, and of Mr. Hardenburgh, surveyor general of California, made more than three years afterwards, in not including within the survey all the land to which under the decree the claimant was entitled.

The only other circumstance relied on in the brief of the special counsel of the United States to show such fraud in procuring the patent as will justify the court in setting it aside is the acceptance by Mr. Hopkins of a gratuitous deed for a portion of the land from the late Col. J. C. Hays, who was part owner of the *rancho*. Some two or three months after making his report to Mr. Hardenburgh, Mr. Hopkins was met by Col. Hays, who, after ascertaining that he was about to go east on a visit, informed him that he was a part owner of the Rancho Muscupiabe, and had been for a long time waiting for a patent, and that he, (Hopkins,) being familiar with the ground, might possibly be able to make some explanation to the commissioner which would cause him to issue the patent without further delay. Mr. Hopkins, who had long been on terms of close friendship with Col. Hays, replied that he would do so with pleasure, if called upon by the commissioner. During Mr. Hopkins' stay in Washington he was called by the commissioner into his office, and gave him a simple explanation of what he knew about the boundaries of the *rancho*, substantially the same as that contained in his report to the surveyor general of California. Mr. Hopkins was absent from California some six months. A short time after his return Col. Hays, he states, walked into his office one afternoon, and said: "Hopkins, you have been, I think, of some service to me. I desire to make you a present of a tract of land in Muscupiabe. I don't know what it may be worth. It may be worth something to your children, and you

are poor, and you have done much service for many persons in this country, and it gives me much pleasure now to make you this little contribution." Mr. Hopkins replied, "Colonel, I don't think that I have been of any such service as would require any compensation, for the patent would certainly have been issued without my interference." Col. Hays appears to have insisted, and produced the deed already made out and signed. Mr. Hopkins accepted the deed, and a few days afterwards transferred the land to a friend to whom he owed some $1,500. This transaction, narrated by Mr. Hopkins himself, the special counsel employed to assist the district attorney declares, in his printed brief, to be "alone sufficient to warrant the government in demanding a rescission of the patent." He does not venture in terms to charge (what would alone impart to the incident any importance, as affecting the decision of this cause) that Mr. Hopkins' report was willfully and knowingly false, and made in pursuance of a corrupt agreement with the late Col. Hays in order to deceive and mislead the surveyor general; and that it did so mislead him, and through him the land department of the government, which was thereby induced to issue a patent which, but for that deception, would have been withheld.

It is unnecessary to consider whether, even in that case, "the well-settled doctrine that the court will not set aside a judgment because it was founded on a fraudulent instrument or perjured evidence, or for any matter which was actually presented and considered in the judgment assailed," would not apply.   *U. S.* v. *Throckmorton, ubi supra.*

That Mr. Hopkins' report expressed his honest opinion on the matter referred to him, no one who knows him, or who like the district judge has for more than 30 years placed the most implicit reliance upon his integrity, and has in the investigation of this class of cases frequently been indebted to him for the detection and exposure of frauds and forgeries involving vast interests, will for a moment doubt. That it was correct may be inferred from the fact that it substantially expresses the conclusions previously reached by Mr. Dallas, chief clerk of surveys, as already mentioned. The idea that Col. Hayes, so well known to the country 50 years ago as the famous Texan ranger and gallant soldier of the Mexican war, would attempt to bribe any public officer, and least of all Mr. Hopkins, is too preposterous to be entertained by anybody acquainted with those gentlemen. Even the special counsel expresses "the wish not to be understood as personally calling into question Mr. Hopkins' integrity, good faith, or good intentions in all his connections with the Muscupiabe *rancho*, but he proceeds to add, that he is forced to say that it would be difficult to conceive of a more open and apparent perversion and prostitution of the important office of referee, or judge of the facts than is here shown." It would be still more difficult to conceive how a report made by an officer, whose "integrity, good faith, and good intentions" are unquestioned, and which was in all probability correct in point of fact, can be considered "an apparent and open perversion and prostitution" of his office, or can be urged upon the court as constituting such a fraud as will authorize it to annul a patent of the

United States. It is proper to add that in notes written on the margin of the brief filed by the special counsel, the district attorney, Mr. Hilborn, has refused to "indorse" the special counsel's statement respecting Mr. Hopkins' testimony, or his strictures upon his action.

The respondents in this case are 49 in number. All of them, the bill avers, hold under the patent issued some 15 years ago, but it alleged that they took with notice of the fraud charged in the bill, *i. e.* the fraud committed by Henry Hancock. What the proofs are in regard to that fraud we have seen. Mr. Hancock's connection with the case seems to have terminated in 1868, when his survey was completed and sent to the surveyor general. The respondents are therefore charged, not on information and belief, but *positively*, with notice of an alleged fraud committed four years before the patent was issued, and which during that period remained unsuspected by the land department at Washington.

The only fraud of which the respondents could have had notice was the "fraud" now charged upon Henry Hancock; and that, as we have seen, consisted in obeying the law by following the decree, and in not restricting the survey to one square league and no more. The proofs utterly fail to show any knowledge on their part of the circumstances under which the original survey was made. If the pleader had any definite idea in making the sweeping and reckless allegation with regard to the 49 respondents in this case, it must have been that they had *constructive notice by the record* that the original petition asked for a tract of the extent of "one league, a little more or less," and that, therefore, the final decree of the board was erroneous.

Upon one other point, which, though not formally presented in this case for our decision, we think it not unfit to make some suggestions, in the hope that they may be brought to the notice of the supreme court, and receive the sanction of that high tribunal. By the act of 1851, all persons claiming lands in California by virtue of any right or title derived from the Mexican or Spanish governments were required to present their claims to the board of commissioners created by that act, and all lands, the claims to which should not be presented within two years after the date of the act, were to be held, deemed, and considered part of the public domain of the United States. The claimants were thus, under pain of forfeiture, forced to enter into a litigation, which has proved arduous, protracted, expensive, and, in some instances, almost ruinous. It is only within a comparatively recent period that proceedings under the act of 1851 and other supplementary special acts of congress can be said to have terminated. The act contained, however, one consolatory assurance, viz., that the final decrees rendered by the commissioners and the district and supreme courts, and any patent issued under that act, should be final and conclusive as between the United States and the claimants.

It would be indecent to suppose that congress, when thus summoning all claimants of land in the ceded territory before tribunals of its own creation did not intend that the United States should appear before them

as a litigant seeking and willing to render justice, contending on equal terms with their adversaries, claiming no rights not conceded to them, and no special privileges as a sovereign. No such pretension was ever made before the tribunals designated in the act.

On the twenty-eighth January, 1876, the then attorney general of the United States, being informed that some fraudulent claims had been finally confirmed, and that patents for them had been or were about to be issued, directed the district attorney "to take the steps necessary to prevent the fraudulent claims from going to patent, and to institute proceedings to set aside fraudulent patents already obtained." This instruction was to be obeyed "on the giving by John B. Howard, special counsel for the United States, security for, or depositing a sufficient sum to defray, all expenses which may be incurred in said legal proceedings." The general authority thus given in form to the district attorney, but practically to John B. Howard, to make an indiscriminate attack upon the titles under which so large a part of the lands in this state are held, and which had been for 20 years or more supposed to be finally settled, was well calculated to create alarm, and even consternation. Mr. John B. Howard having given bonds in the sum of $1,000 to defray all the expenses of the proceedings, suits were commenced to set aside the decrees of confirmation, and to annul the patents, for three of the most valuable *ranchos* in the state. The bills alleged fraud. But the fraud charged was in obtaining the confirmation of the claims by the presentation of title papers, which the bills alleged to be fraudulent, but which the final decrees of confirmation had adjudicated to be genuine and valid. This court refused to entertain the bills. *U. S.* v. *Flint, supra; U. S.* v. *Throckmorton, supra; U. S.* v. *Carpenter*, 4 Sawy. 42. And its decree was unanimously affirmed by the supreme court. *U. S.* v. *Throckmorton, ubi supra.* This attempt to cloud the titles of this state, and to reopen before a tribunal, upon which no jurisdiction to determine the validity of Mexican grants has been conferred, questions long before adjudicated by decrees declared by the law to be conclusive as against the United States, thus received its final quietus.

The attack upon the patent in the present case is founded on alleged fraud in the location and survey. The survey complained of was made 19 years ago. The patent issued 15 years ago. The error or fraud, as it is called, is in the alleged non-conformity of the boundaries adopted in the survey with the natural objects called for in the decree. During all this time this non-conformity, if it exists, could have been discoverd and exposed. For 15 years the government has slept upon its rights, and tacitly permitted interests to be acquired, orchards and vineyards to be planted, and homes established upon the land by parties who have relied upon the security of title, supposed to be afforded by a patent of the United States. And now, when these parties, summoned into a court of equity and forced into an expensive and perhaps protracted litigation, raise the objection that the great lapse of time since the issue of the patent, the long neglect of the government to assert its alleged rights, and its tacit recognition of the rights claimed under the patent, consti-

tute an equitable bar to the action, they are met by the reply that no laches can be imputed to the government, nor does any time run against the sovereign.

The present suit, if not a proceeding under the act of 1851, is at least a sequel to the compulsory litigation required by that act. "It is a part of the same suit." *U. S.* v. *Throckmorton*, 98 U. S. 65, per Mr. Justice MILLER. It is for the attainment of the same general object, viz., the determination of the respective rights of the United States and of claimants under Mexican grants to lands in California.

By the act of 1851, the government summoned the claimants to a controversy in which it consented to appear as an equal litigant, and impliedly waived and renounced all rights and prerogatives peculiar to it as a sovereign. Is it now at liberty to resume its waived and renounced prerogatves, abandon its attitude as an equal litigant, and assert rights, which, but for its sovereignty, would be forever barred? It is difficult to discover what public interest is subserved by the institution of the present proceeding. All the land now claimed to have been erroneously included in the survey is held, with the exception of 600 acres, by the purchasers under the patent. If the United States had prevailed in this suit, was it proposed to drive all these persons from their homes and cultivations, and dispose of their holdings and improvements to preemptors, at the rate of $1.25 per acre? Or, if so great an injustice, not to say absurdity, was not contemplated, was it intended to allow them to retain their homes on payment of a like sum per acre, as a kind of penalty for believing that the patent of the United States conveyed an indefeasible title? Some thousands of dollars might, by these means, have been gained for the treasury, a benefit utterly insignificant when compared with the evils and *public* loss which must necessarily result from the institution of proceedings which cast a cloud upon the titles under which so large a portion of the lands of this state are held. More than 36 years have elapsed since the passage of the act entitled "An act to ascertain and *settle* the private land claims in the state of California." The numerous class of our citizens who hold lands under patents issued, it may be 10 or 20 years ago, have a right to rest in the security of unassailable titles; and all classes of the inhabitants of the state may well claim that immigration shall no longer be repelled, alienations hindered, improvements discouraged, and the development of our resources retarded, by the fear or threat of litigations from which, as is claimed, no lapse of time can secure exemption, and to which no neglect on the part of the government, to assert its rights, can be set up as an equitable bar.

Our conclusions are: (1) That the decree of the board of land commissioners was for a tract of land with designated boundaries and not for a specific quantity of land; that this decree was final and conclusive; and that the survey was by law required to be in conformity with the decree. (2) If the government has lost any land to which it was entitled, which we by no means affirm, it was through error in the decree, which cannot now be corrected. (3) That there is no satisfactory proof that fraud was in fact committed by any one in procuring the survey or

its approval, or the issue of the patent based upon it; and certainly no proof of any such fraud as would, under the settled doctrines of equity and the decisions of the supreme court, authorize this court to set aside and annul the patent.

SAWYER, C. J., concurs.